# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BUCKEYE PARTNERS, L.P., and BUCKEYE PT TERMINALS, LP, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | C.A. No. 2020-0255-JTL |
| | ) | |
| GT USA WILMINGTON, LLC, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: May 12, 2020
Date Decided: May 20, 2020

Jody C. Barillare, Amy M. Dudash, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware; Michael D. Blanchard, MORGAN, LEWIS & BOCKIUS, LLP, Hartford, Connecticut; Julie S. Goldemberg, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania; *Attorneys for Plaintiffs.*

Jonathan M. Stemerman, ELLIOTT GREENLEAF, P.C., Wilmington, Delaware; Thomas J. Elliott, Frederick P. Santarelli, Jack P. Elliott, Colin J. O'Boyle, ELLIOTT GREENLEAF, P.C., Blue Bell, Pennsylvania; *Attorneys for Defendant.*

**LASTER, V.C.**

From 2008 until the present, Magellan Terminal Holdings, L.P. ("Magellan") has operated a terminalling business at the Port of Wilmington involving the transportation and storage of liquid petroleum. In March 2020, plaintiff Buckeye Partners, L.P. ("Buckeye Parent"), acquired Magellan and changed its name to Buckeye PT Terminals LP ("Buckeye").

After the acquisition, Buckeye continued to operate the terminalling business. In simplified terms, Buckeye rents a dock from the Port. A manifold under the dock connects to pipes that run under the Port. The pipes lead to fuel storage tanks located on a property adjacent to the Port that Buckeye owns (the "Tanks"). When a ship brings liquid petroleum to the dock, a Buckeye employee connects a hose to the ship, and the liquid petroleum runs through the hose, into the manifold, through the pipes, and into the Tanks. Buckeye stores the liquid petroleum in the Tanks until its customers pick it up using tanker trucks.

The principal route in and out of the Port is a private lane called Sico Road. The only means of accessing the Tanks is via Sico Road. For the past twelve years, Buckeye and its customers have used Sico Road to access the Tanks.

In 2018, defendant GT USA Wilmington, LLC ("GT") took over the Port. GT imposed a "Terminal Usage Fee" on stevedores based on the volume of cargo that they load or unload. Before it was acquired by Buckeye, Magellan maintained that it was not obligated to pay the Terminal Usage Fee, both because it was not a stevedore and because it was already paying a volume-based fee under the lease for the dock. After the acquisition, Buckeye continued to maintain that it was not obligated to pay the Terminal Usage Fee.

The nature of the resulting dispute was simple: GT thought Buckeye owed it money. Buckeye said it did not. In a civil society, courts exist to resolve this type of dispute.

Instead of filing a lawsuit, GT took matters into its own hands. GT told Buckeye that it would bar its customers from using Sico Road to access the Tanks unless Buckeye capitulated, paid the past-due amounts, and agreed to pay the Terminal Usage Fee going forward. GT then followed through on its threat and barred Buckeye's customers from using Sico Road to access the Tanks.

Buckeye responded by filing this action. Buckeye maintains that it does not owe the Terminal Usage Fee and that even if it did, GT was not entitled to blockade the Tanks. Buckeye seeks a preliminary injunction barring GT from preventing Buckeye and its customers from accessing the Tanks pending the outcome of this litigation.

This decision grants the requested preliminary injunction. Buckeye has shown a reasonable probability of success on the merits of its claims. Buckeye also has established a threat of irreparable harm and demonstrated that the balancing of the equities favors the issuance of an injunction.

At bottom, a limited injunction preserving the status quo is necessary so that the parties can litigate their dispute over the Terminal Usage Fee and obtain a judicial ruling interpreting the relevant documents. Absent an injunction, GT will resume its blockade and force Buckeye to capitulate. Due respect for the rule of law requires that a court decide the underlying dispute.

# I.  FACTUAL BACKGROUND

The facts are drawn from the record developed in connection with the plaintiffs' application for a preliminary injunction. What follows are the facts as they appear likely to be found after trial, based on the current record.

## A.  The Lease

Since 2008, Magellan has leased "[a]pproximately 1,160 linear feet of dock space" from Diamond State Port Corporation, the owner of the Port. *See* Dkt. 81 at '174 (the "Lease" or "Lease Agr."). The "Reference Page" for the Lease summarizes its purpose as follows: "For the purpose of operating certain docking facilities for the transportation and storage of oil, petroleum products, hydrocarbons and their derivatives and for the installation and operation of a mooring dolphin with catwalks and utilities." *Id.* at '174. Similar language appeared in Section 7(b) of the Lease. *See id.* § 7(b).

Section 2 of the Lease states that in addition to the approximately 1,160 linear feet of dock space, the Landlord (Diamond State) grants the Tenant (Magellan)

> full rights of access for ingress and egress to the dock, walkway, and if available, reasonable parking space at the dock, and ingress and egress over existing roads owned or controlled by Landlord for access to the dock (collectively the "Premises") and as depicted on the drawing marked as **Exhibit "A"** attached hereto . . . .

*Id.* § 2 (emphasis in original). Diamond State also committed to grant and convey to the Tenant "an easement with rights and privileges for all existing and planned dock lines and the existing Conectiv pipeline" and a further easement "to facilitate Tenant's dock lines and the Conectiv pipeline . . . ." *Id.* And the Landlord agreed to grant the Tenant any other

3

easements involving its property that were "necessary or desirable for the performance of Tenant's business . . . ." *Id.* § 9.

Consistent with the commitment in the Lease, Diamond State granted Magellan a "pipeline easement and a temporary construction easement over and across a portion of the [Port] in connection with the construction of the new Pipelines . . . ." Dkt. 63 Ex. 20 at '759 (Recitals); *see* Lease Agr. §§ 2, 9. The easement allowed Magellan to access the Port "to survey, construct, install, operate, protect, use, inspect, maintain, replace, remove and repair the Pipelines." Dkt. 63 Ex. 20 § 1(a).

Magellan already owned the parcel of land adjacent to the Port where the Tanks are located. The Lease quite obviously recognized the connection between the dock and the Tanks. The Lease acknowledged that Magellan would be storing liquid petroleum, and that only happened at the Tanks.

The parties also clearly contemplated that Magellan would accept liquid petroleum at the dock, run it through the manifold under dock and into the pipes under the Port, then store it in the Tanks. To that end, Magellan agreed to pay a fee to Diamond State based on the amount of liquid petroleum that crossed the dock. Section 5(c) of the Lease stated,

> In addition to Rent, Tenant shall pay to Landlord a fee based on the total number of barrels of oil, petroleum products, hydrocarbons and their derivatives crossing the dock entering into the Premises plus the total number of barrels of oil crossing the dock exiting from the Premises annually throughout the term of this Lease.

Lease Agr. § 5(c) (the "Volume-Based Fee").

For the past twelve years, Magellan (now Buckeye) has used these rights to provide the "terminalling services" described in the Lease. Magellan (now Buckeye) receives liquid

4

petroleum at the dock by connecting a hose to a barge or other ocean-going ship. The liquid petroleum flows through the hose, into a manifold under the dock, through the pipes under the Port, and ultimately into the Tanks. The liquid petroleum then is stored in the Tanks until customers take delivery using tanker trucks.

For the past twelve years, Sico Road has provided the only means of accessing the Tanks. During this period, Magellan and its customers have used Sico Road to access the Tanks.

**B.      GT Takes Over The Port.**

In October 2018, GT took over the management of the Port under a concession agreement with Diamond State. Compl. Ex. D (the "Concession Agreement" or "Con. Agr."). GT agreed to "materially invest in redeveloping the existing port" and to pay "a Concession Fee" to Diamond State. *Id.* at 1 (Recitals). The Concession Fee is calculated based on the volume of various types of cargo that travel through the Port. *See id.* § 4.3. The Concession Agreement requires GT to "faithfully obey and comply with all existing leases and agreements . . . ." *Id.* § 2.3(b).

On December 1, 2018, GT published a "Terminal Tariff," which included a schedule of rates that GT would levy against "persons who use or benefit from use of the terminal." Compl. Ex. E at 8. Under federal maritime regulations, the Terminal Tariff operates as "an implied contract between the marine terminal operator and the party receiving the services rendered by the marine terminal operator . . . ." 46 C.F.R. § 525.2(a)(2). But "[i]f the marine terminal operator has an actual contract with a party covering the services rendered by the

5

marine terminal operator to that party," then the "actual contract" controls. *Id.* § 525.2(a)(3).

The Terminal Tariff established a "Terminal Usage Fee," defined as "a charge, separate from Wharfage, against the Stevedore for fees related to the public private partnership agreement" and calculated based on "all cargo discharged or loaded at the Port." Compl. Ex. E at 7, 44. The Terminal Tariff defined "Stevedoring" as "the physical handling of Container(s) or Cargo between the Vessel and the [Container Yard]." *Id.* at 7; *see also id.* at 5 (defining "Cargo" to include "all types of bulk . . . or any other forms of Cargo whatsoever, including but not limited to any . . . liquid").[1]

### C. The Dispute Between Magellan And GT

Magellan did not pay the Terminal Usage Fee. GT maintained that Magellan owed the Terminal Usage Fee and contacted Magellan to about the unpaid amounts. In August 2019, GT sent a "Final Notice" instructing Magellan to pay $172,401.96. *See* Compl. Ex. F. GT told Magellan that "if payment in full is not made by August 31, 2019, you will be denied access to the Port of Wilmington." *Id.*

Magellan responded that it was not obligated to pay the Terminal Usage Fee. Magellan noted that "the Terminal Usage Fee is assessed against a stevedore," and "Magellan does not employ third-party stevedores . . . ." Compl. Ex. G. Magellan also

---

[1] On January 1, 2020, GT published a revised tariff. Compl. Ex. H. It defined the "Terminal Usage Fee" as "[a] separate charge assessed against the Stevedore." *Id.* at 6. It defined "Stevedoring" as "[t]he act of unloading or loading of ship's cargo from the ship." *Id.* It defined "Stevedore" to mean "[t]he entity hired to load or unload the vessel." *Id.*

6

argued that the Terminal Usage Fee was "redundant" because it duplicated the Volume-Based Fee in the Lease. *Id.* Magellan contended that that the Terminal Usage Fee was "an attempt to renegotiate the Lease and to twice charge Magellan for its receipt and delivery of barrels of product to and from the Premises." *Id.*

In September 2019, Magellan and GT began negotiating a settlement. According to GT, Magellan agreed to pay additional amounts, although less than the total amount owed, and to blend the Terminal Usage Fee into a higher rental rate under the Lease. The negotiations continued into early January 2020. *See* Iannarelli Decl. ¶¶ 14–15 & Exs. 4, 5.

**D.      Buckeye Parent Acquires Magellan.**

In mid-January 2020, Buckeye Parent agreed to acquire Magellan. As a result, Buckeye Parent would gain control of the Tanks, Magellan's rights under the Lease, and the related easements.

On January 23, 2020, Magellan notified GT that Buckeye Parent would acquire Magellan. In early February, Buckeye Parent and GT discussed the dispute over the Terminal Usage Fee. Buckeye Parent said that it would negotiate to resolve the dispute, but not until after the acquisition closed because of anti-gun-jumping restrictions under the antitrust laws. Buckeye Parent told GT that the deal would close sometime between early March and early June and that they could discuss the dispute then.

GT rejected that timeline as unacceptable. GT insisted on full payment of all outstanding invoices, plus interest, within the next ten calendar days. Buckeye Parent stood by its position.

7

On March 13, 2020, GT contacted Magellan about a number of issues, including the Terminal Usage Fee. GT asserted that the balance due now exceeded $1 million, up from the $172,401.96 that GT had identified seven months earlier. GT told Magellan that as of March 31, 2020, GT would require Magellan to maintain a deposit of $260,000 with the Port. GT rescinded its earlier agreement not to bill the Terminal Usage Fee while GT and Magellan had been negotiating a resolution.

**E.      GT Blockades The Tanks.**

On March 20, 2020, Buckeye Parent completed its acquisition of Magellan and changed its name to Buckeye. On March 23, Buckeye notified GT that the acquisition had closed. Eight days later, on April 1, GT told Buckeye that it would block Buckeye's customers from using Sico Road to access the Tanks unless Buckeye paid the past-due Terminal Usage Fee by April 6.

Also on April 1, 2020, GT contacted Buckeye's largest customer, Wawa Wholesale Fuels, LLC, to inform them that unless Buckeye capitulated, GT would prevent Wawa from using Sico Road to access the Tanks beginning on April 6. GT even contacted the tanker truck companies that Wawa frequently used to let them know that they would be denied access to Sico Road and the Tanks.

Wawa immediately contacted Buckeye. Wawa told Buckeye that the situation "raised a great deal of angst" and "caused [Wawa] great concern." Compl. Ex. Q.

On April 2, 2020, Buckeye told GT that it remained committed to reaching a commercially reasonable resolution and asked GT to revoke its demand and retract its

8

threats. On April 3, GT asked for a good faith economic proposal and reiterated that it would deny access to the Port if the dispute was not resolved.

## F.     This Litigation

On April 6, 2020, GT blocked Wawa's tanker trucks from entering Sico Road and accessing the Tanks. Because of the blockade, Wawa's tanker trucks could not retrieve Wawa's fuel.

That same day, Buckeye filed this litigation. Buckeye immediately moved for a temporary restraining order to restore the status quo. Later that day, this court held a hearing and issued the temporary restraining order. The court scheduled a prompt hearing to determine whether the temporary restraining order should be replaced with a preliminary injunction.

## II.     LEGAL ANALYSIS

At bottom, the parties disagree over whether Buckeye has to pay the Terminal Usage Fee. That is a dispute over money damages, and a lawsuit should have been filed in an appropriate court to resolve that issue. Instead, GT exercised self-help by blockading the Tanks.

Buckeye's application for a preliminary injunction seeks to maintain the pre-blockade status quo so that the parties can litigate their dispute over the Terminal Usage Fee. To obtain a preliminary injunction, a plaintiff must demonstrate (i) a reasonable probability of success on the merits, (ii) a threat of irreparable harm if an injunction is not granted, and (iii) that the balance of the equities favors the issuance of an injunction. *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Co.*, 506 A.2d 173, 179 (Del. 1986). "The

9

elements are not necessarily weighted equally. A strong showing on one element may overcome a weak showing on another element. However, a failure of proof on one of the elements will defeat the application." *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998).

## A.     The Probability Of Success On The Merits

The first element of the test for a preliminary injunction requires that the plaintiff establish a reasonable probability of success on the merits. *See Gimbel v. Signal Cos., Inc.*, 316 A.2d 599, 602 (Del. Ch. 1974), *aff'd*, 316 A.2d 619 (Del. 1974) (per curiam). "A party showing a reasonably probability of success must demonstrate that it will prove that it is more likely than not entitled to relief." *C & J Energy Servs., Inc. v. City of Miami Gen. Emps.'*, 107 A.3d 1049, 1067 (Del. 2014) (internal quotation marks omitted). To prevail at trial, a plaintiff need only establish its claims by a preponderance of the evidence, which "means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (internal quotation marks omitted). Linking the standards together demonstrates that a plaintiff need not show at the preliminary injunction stage that it will prevail at trial. The resulting standard for a preliminary injunction "falls well short of that which would be required to secure final relief following trial, since it explicitly requires only that the record establish a reasonable probability that this greater showing will ultimately be made." *Cantor Fitzgerald*, 724 A.2d at 579 (internal quotation marks omitted). That said, the "burden is not a light one," and a preliminary

injunction "will never be granted unless earned." *Wayne Cty. Emps.' Ret. Sys. v. Corti*, 954 A.2d 319, 329 (Del. Ch. 2008).

Buckeye has established a reasonable probability of success on the merits of its claims that by blocking access to Sico Road, GT (i) breached the express terms of the Lease, and (ii) breached the implicit terms of the Lease that are supplied by the implied covenant of good faith and fair dealing. This does not mean that Buckeye ultimately will prevail, only that Buckeye has made a showing sufficient to warrant preserving the status quo so that Buckeye can have a fair opportunity to present its claims and have them adjudicated. Because these claims are sufficient to support the issuance of injunctive relief, this decision does not reach Buckeye's other claims.

### 1. Breach Of The Lease

Buckeye has established a reasonable probability of success on a claim that GT breached its obligations under the Lease. "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003); *see Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1279 n.28 (Del. 2016). "A lease is a contract by which one person divests himself of, and another takes the possession of [real property] for a term, whether long or short." *Lewes Sand Co. v. Graves*, 8 A.2d 21, 24 (Del. 1939) (internal quotation marks omitted). "The customary rules of construction of written contracts and instruments apply in the construction of [a] lease . . . ." *Grotto Pizza, Inc. v. Ocean Bay Mart, Inc.*, 1998 WL

388402, at *6 n.32 (Del. Ch. June 30, 1998) (quoting 49 Am. Jur. 2d *Landlord & Tenant* § 509 (Lawyers Coop. 1995)).

When interpreting a contract, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted). "It is well established that a court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

"Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (footnote omitted). If the language of an agreement is ambiguous, then the court "may consider extrinsic evidence to resolve the ambiguity." *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014). Permissible sources of extrinsic evidence include "overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry." *Id.* (internal quotation marks omitted). A court may consider "evidence of prior agreements and communications of the parties as well as trade usage or course of dealing." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997). "When the terms of an agreement are ambiguous, 'any

12

course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.'" *Sun-Times Media Gp. v. Black*, 954 A.2d 380, 398 (Del. Ch. 2008) (quoting *Restatement (Second) of Contracts* § 202).

The parties agree that the Lease is a valid contract, but they dispute whether it entitles Buckeye to use Sico Road. Under the Lease, the Tenant leased from the Landlord

> approximately 1,160 linear feet of docking space together with full rights of access for ingress and egress to the dock, walkway, and if available, reasonable parking space at the dock, and ingress and egress over *existing roads owned or controlled by Landlord* for access to the dock (collectively the "Premises") and as depicted on the drawing marked as **Exhibit "A"** attached hereto . . . .

Lease Agr. § 2 (first emphasis added). Exhibit A to the Lease depicts the docking space, but it is not clear whether Sico Road is a route that can be used to access the dock.

Buckeye and GT offer different interpretations of this provision. Buckeye argues that it has a right to use Sico Road because it is an "existing road owned or controlled by [the] Landlord for access to the dock." GT responds that Buckeye does not have any "legally recognizable right to travel upon [Sico Road] absent GT's permission." Dkt. 77 at 51. The parties also dispute whether the right of access to Sico Road authorizes Buckeye and its customers to use Sico Road to access the Tanks, as opposed to the dock.

At this stage of the case, both sides have offered a reasonable reading of the Lease. It is not possible at this stage to determine as a matter of law that either Buckeye or GT is correct.

For present purposes, the scope of Buckeye's right of access under the Lease is ambiguous. "In light of the general principle which gives the tenant free use of demised

13

premises, any restrictions are construed narrowly against the landlord and ambiguities are resolved in favor of the lessee." *Grotto Pizza*, 1998 WL 388402, at *7 (quoting 49 Am. Jur. 2d § 510). This interpretative canon favors Buckeye.

The extrinsic evidence at this stage of the case also favors Buckeye. The parties' past practice, before any dispute arose, provides strong evidence of how the parties themselves understood the provision. For at least twelve years, Buckeye and its customers have used Sico Road to access the Tanks. A barrier gate separates Sico Road from the adjoining public roads, so GT (or Diamond State) had to take action to allow Buckeye (or Magellan) and its customers to travel through the barrier gate to reach Sico Road and the Tanks. The fact that Buckeye and its customers have accessed the Tanks via Sico Road for twelve years is strong evidence that the Lease includes a right to use Sico Road to access the Tanks.

GT observes that "[i]n giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract." Dkt. 77 at 39–40 (quoting *Heartland Payments Sys., LLC v. inTEAM Assocs., LLC*, 171 A.3d 544, 557 (Del. 2017)). Reading the Lease as a whole indicates that the parties contemplated that the Tenant would have the right to access the Tanks via Sico Road. Under the Lease, the Tenant leases the dock "for the transportation and storage" of liquid petroleum. Lease Agr. at '174. The storage function takes place at the Tanks. In the Lease, the Landlord committed to grant the Tenant an easement for the pipes that run under the Port and connect the dock to the Tanks. Customers retrieve the liquid petroleum from the Tanks using tanker trucks. Schaller Decl. ¶ 6. The tanker trucks can only get to the Tanks using Sico Road. *Id.* ¶ 11.

14

The business arrangement relies on the seamless transportation of liquid petroleum from the dock to the Tanks and from the Tanks to customers. If customers cannot use Sico Road, then the commercial arrangement unravels, and it becomes impossible to give sensible life to the real-world contract reflected by the Lease.

It is undisputed that on April 6, 2020, GT blocked Buckeye's customers from accessing Sico Road and reaching the Tanks. If Buckeye had a right under the Lease to use Sico Road, then GT breached that right.

### 2. Breach Of The Implied Covenant

Buckeye has established a reasonable probability of success on the merits of a claim that GT breached the implied covenant of good faith and fair dealing that inheres in the Lease by blocking access to Sico Road.

> The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated. It applies when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting.

*Dieckman v. Regency GP*, 155 A.3d 358, 367 (Del. 2017) (footnotes and internal quotation marks omitted).

To prevail on a claim for breach of the implied covenant, a plaintiff must prove "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998). To establish the implied contractual obligation, the plaintiffs must show "from what was expressly agreed upon that the parties who negotiated the express terms of

15

the contract would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter." *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986). "The implied covenant seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them." *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013) (internal quotation marks omitted), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 814 n.13 (Del. 2013). "The implied covenant is well-suited to imply contractual terms that are so obvious . . . that the drafter would not have needed to include the conditions as express terms in the agreement." *Dieckman*, 155 A.3d at 361.

Based on the record at this stage, it is reasonably probable that if the parties had thought to address the issue when negotiating the Lease, they would have agreed that the Landlord could not block the Tenant or its customers from using Sico Road to access the Tanks. The Lease and related easements evidence the parties' understanding that the Tenant would use the dock as part of a terminalling business that was integrated with the Tanks. It would have been obvious to the parties that the Tenant's customers needed to access the Tanks via Sico Road and that without that access, the commercial arrangement documented in the Lease and associated easements made no sense. The need for access to the Tanks via Sico Road is so obvious that it would not have occurred to the parties to address it. Not surprisingly, the Tenant in fact has used Sico Road to access the Tanks for at least twelve years.

16

It also is reasonably probable that if the parties had thought to address the issue when negotiating the Lease, they would have agreed that the Landlord was required to act in good faith when restricting access to the leased premises and the Tanks. It is reasonably probable that GT did not act in good faith when it demanded that Buckeye Parent address the dispute over the Terminal Usage Fee before it completed its acquisition of Magellan, when Buckeye Parent could not discuss the issue because of antitrust regulations. GT then informed Buckeye one week after the acquisition had closed, and in the midst of the COVID-19 pandemic, that GT would cut off access to Sico Road and the Tanks if Buckeye did not capitulate within five business days.

It is undisputed that on April 6, 2020, GT blocked Buckeye's customers from accessing Sico Road and reaching the Tanks. Buckeye has established a reasonable probability of success on its claim that GT breached the implied covenant by blockading the Private Road.

### 3. The Additional Dimension Of Self Help

The likelihood of Buckeye prevailing on its claims is stronger because GT resorted to self-help. Under Delaware law, "landlords, including commercial landlords, cannot use the remedy of self-help." *Affordable Autos, Inc. v. Dietert*, 2016 WL 1169244, at \*5 (Del. Super. Mar. 24, 2016); *Carriage Realty P'ship v. All-Tech Auto., Inc.*, 2001 WL 1526301, at \*8 (Del. Ch. Nov. 27, 2001); *see also* 25 *Del. C.* §§ 5101(b), 5313. Self-help is any "attempt to redress a perceived wrong by one's own action rather than through the normal legal process." *Self-help*, BLACK'S LAW DICTIONARY (11th ed. 2019). The purpose of the prohibition on the use of self-help is to force landlords to invoke proper legal remedies

17

through a court of law, rather than engaging unilaterally in conduct that could lead to breaches of the peace. *See Malcolm v. Little*, 295 A.2d 711, 713–14 (Del. 1972).

Landlords wrongfully use self-help if they physically retake possession of the leased premises or exclude the tenant, such as by changing the locks. *See, e.g.*, *Bayview Loan Servicing LLC v. Edwards*, 2017 WL 1019729, at \*1 (Del. Super. Mar. 13, 2017) (ORDER); *Affordable Autos*, 2016 WL 1169244, at \*5. GT did not literally do that, but its actions were closely analogous. GT blocked Buckeye's customers from accessing Sico Road. By doing so, GT prevented Buckeye's customers from reaching the Tanks. As GT knows, Buckeye's business at the Port depends on a seamless relationship between the dock and the Tanks. Under the Lease, Buckeye has the right to use the dock for the purpose of "the transportation and storage" of liquid petroleum. As GT knows, the "storage" takes place at the Tanks.

By blocking Buckeye's customers from accessing Sico Road and the Tanks, GT deprived Buckeye of the right to use the docks for the purposes that had been agreed upon in the Lease. GT deprived Buckeye of its rights indirectly, rather than directly, but the result remained the same: GT used self-help in an effort to force Buckeye to concede on an issue that fairly was subject to dispute. Buckeye has established a reasonable likelihood of being able to show at trial that GT's resort to self-help was wrongful.

### 4. The Dispute Over The Terminal Usage Fee

Buckeye separately argues that GT acted wrongfully by imposing the blockade based on the Terminal Usage Fee because Buckeye is not obligated to pay the Terminal Usage Fee. This is the gravamen of the underlying dispute, and the outcome turns on the

18

answers to three questions. First, is the Volume-Based Fee in the Lease an "actual contract" that supersedes the Terminal Usage Fee in the Terminal Tariff? If not, is Buckeye a "Stevedore" or did it employ "Stevedores" such that Buckeye is subject to the Terminal Usage Fee? And if so, should GT be barred from collecting the Terminal Usage Fee because it has collected the fee selectively in violation of federal law?

These are difficult issues, and both parties have advanced credible arguments in their favor. On the issue of whether Buckeye engages in stevedoring within the customary industry understanding of that term, both parties have submitted opinions from experts, and they reach diametrically opposite conclusions.

At this stage of the case, it is not necessary to predict how the court may rule after trial on the competing arguments. The purpose of this ruling is to preserve the status quo so that these issues can be addressed in due course, rather than by GT forcing Buckeye to capitulate through the exercise of self-help.

## B.     Irreparable Harm

The second requirement for a preliminary injunction is a showing of irreparable harm if the injunction is not granted. *Revlon*, 506 A.2d at 179. Harm is irreparable unless "[a]lternative legal redress [is] clearly available and [is] as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 557 (Del. Ch. 2000) (alteration in original) (footnotes and internal quotation marks omitted). "Irreparable injury exists when [damages] would involve speculation," such as harmed "reputation, goodwill, customer relationships, and employee morale." *In re Shawe & Elting LLC*, 2015 WL 4874733, at

*28 (Del. Ch. Aug. 13, 2015) (internal quotation marks omitted), *aff'd sub nom.*, *Shawe v. Elting*, 157 A.3d 152 (Del. 2017). For that reason, "the danger of losing valuable revenue-generating relationships is a harm that may not be compensable in any manner other than injunctive relief." *ZRii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *13 (Del. Ch. Sept. 21, 2009).

Absent an injunction, Buckeye faces a threat of irreparable harm. Buckeye cannot operate its business without access to the Tanks. The blockade threatens Buckeye with irreparable harm to its reputation, goodwill, and customer relationships.

The effect on Buckeye's relationship with Wawa is both illustrative and sufficient to satisfy the requirement of irreparable harm. Wawa accounts for approximately 85% of Buckeye's business at the Port. Under the agreement between Wawa and Buckeye, Wawa transfers fuel to the Tanks from two refineries via pipelines and ocean-going vessels. The fuel is stored in the Tanks until Wawa can retrieve it using tanker trucks. On average, Wawa throughputs at least 25,000 barrels of fuel every day from the Tanks to its convenience stores and gas stations in Delaware, Pennsylvania, New Jersey, and Maryland. This volume equates to approximately 150 tanker trucks accessing the Tanks each day.

Depriving Wawa of access to the Tanks risks disrupting the supply of fuel to approximately 150 Wawa gas stations in the four-state region. Depriving Wawa of access to the Tanks also could force Wawa to shut down its refineries until Wawa could make other arrangements to transport its fuel. It could take weeks or even months for Wawa to make alternative arrangements.

20

Given the negative effect that the blockade would have on Wawa's business, it is obvious that the blockade would negatively affect Buckeye's relationship with Wawa. Indeed, after learning that GT planned to blockade the Private Road, Wawa threatened to sue Buckeye for breach of contract. Accordingly, Buckeye has established a threat of irreparable harm sufficient to support injunctive relief.

## C.    Balancing Of Hardships

The final element of the injunction standard is the balancing of hardships:

> [A] court must be cautious that its injunctive order does not threaten more harm than good. That is, a court in exercising its discretion to issue or deny such a preliminary remedy must consider all of the foreseeable consequences of its order and balance them. It cannot, in equity, risk greater harm to defendants, the public or other identified interests, in granting the injunction, than it seeks to prevent.

*Lennane v. ASK Comput. Sys., Inc.*, 1990 WL 154150, at *6 (Del. Ch. Oct. 11, 1990) (Allen, C.). The equities favor Buckeye.

The preliminary relief that Buckeye requests merely will preserve the status quo as it has existed for twelve years while the parties litigate their dispute over the Terminal Usage Fee. GT argues that the injunction would force GT to suffer Buckeye and its customers' heavy traffic on the Port's private property without compensation, resulting in a continuing trespass. *See* Dkt. 66 at 57. But that supposed continuing trespass has been going on for twelve years, and GT has never sought compensation for it. This decision also has held that Buckeye has a reasonable probability of succeeding on the merits on its claim that it is entitled to use Sico Road to access the Tanks. If Buckeye prevails on that claim, then Buckeye has the right to access Sico Road in return for the rent it pays under the Lease.

21

This decision has found that without an injunction, Buckeye faces a threat of irreparable harm to its business. For its part, GT merely is seeking fees that it has been pursuing since 2019. GT has not suffered any irreparable harm from the delay in payment, nor will it. An award of interest can address the lost time value of money. Any supposed harm to GT is far outweighed by the risk of irreparable harm to Buckeye's business and the public interest. The balancing of the equities favors granting the injunction.

## D.     The Injunction Bond

Under Court of Chancery Rule 65(c), "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the Court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." When this court entered the temporary restraining order on April 6, 2020, the bond was set at $1 million, without security, because GT's counsel identified that figure as the amount that GT claimed was due, and Buckeye's counsel agreed to a bond in that amount. *See* Dkt. 16; Dkt. 54.

The amount of an injunction bond must be tied to the losses that can be proximately caused by a wrongful injunction. *See Guzzetta v. Serv. Corp. of Westover Hills*, 7 A.3d 467, 470 (Del. 2010). The amount of the unpaid Terminal Usage Fee defines the damages that GT stands to recover if it succeeds on its underlying claim. That is a different issue than the amount of harm that GT potentially faces from a wrongful injunction. GT's claim to the Terminal Usage Fee will be adjudicated on the merits. If GT prevails, then it will be entitled to the full amount due, notwithstanding the issuance of the injunction. Nor does

22

GT risk any loss from a delay in receiving any amounts that are due because Delaware law awards pre-judgment interest as a matter of right. *See Moskowitz v. Mayor & Council of Wilm.*, 391 A.2d 209, 210 (Del. 1978). If GT loses, then it is not entitled to any funds and will not have been harmed.

The amount of the Terminal Usage Fee thus has no logical relationship to the harm from a wrongful injunction. The real risk of harm from a wrongful injunction is any damage from Buckeye and its customers accessing the Tanks from Sico Road during the pendency of this litigation. There necessarily is some degree of wear and tear associated with access. There also is the risk of an accident, which logically would be addressed through insurance. More broadly, there is some amount of executive time and expense that GT must devote to addressing the injunction. *See Emerald P'rs v. Berlin*, 1998 WL 474195, at *4 (Del. Ch. Aug. 3, 1998), *aff'd*, 726 A.2d 1215 (Del. 1999).

"The party seeking an injunction bond must support its application with facts of record or some realistic [*sic*] as opposed to a yet-unproven legal theory from which damages could flow to the party enjoined." *Guzzetta*, 7 A.3d at 470 (alterations and internal quotation marks omitted). GT has not quantified any harm that would result from the injunction, as opposed to its claim for the Terminal Usage Fee.

Given the absence of any quantification by GT, the $1 million bond remains sufficient to protect GT's interests in the event that GT has been enjoined wrongfully. It seems likely that this amount errs considerably to the high side. To reiterate, regardless of whether GT has been enjoined wrongfully, it will be entitled to recover the Terminal Usage

23

Fee if it prevails on its underlying claim. The sole purpose of the injunction is to re-establish the status quo that existed for twelve years before GT exercised self-help.

## III.    CONCLUSION

GT is enjoined from preventing Buckeye and its customers from accessing the Tanks from Sico Road pending a final ruling on the merits in this litigation. Bond remains set at $1 million, without any requirement to post security.